IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| VIRGINIA BRANDS, LLC, | ) | |
| | ) | 4:10CV00009 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| KINGSTON TOBACCO | ) | |
| COMPANY, INC., | ) | By: Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendant. | ) | |

On January 21st, 2010, Plaintiff Virginia Brands, LLC filed a lawsuit against Defendant Kingston Tobacco Company, Inc. in the Circuit Court of Halifax County. The Defendant was served on February 22nd, 2010 and timely removed the case to this Court on March 15th, 2010. The Court held a bench trial on November 1st and 2nd, 2010. For the reasons explained below, the Court **ENTERS JUDGMENT IN FAVOR OF THE PLAINTIFF IN THE AMOUNT OF $5,257,644.92**.

## THE UNCONTROVERTED FACTS

On November 1st, 2010, the parties presented the Court with Joint Stipulations of Facts, which the Court adopted. Joint Stipulations of Facts, Nov. 1, 2010, ECF No. 68. The Joint Stipulations provide that the Virginian Plaintiff and the North Carolinian Defendant entered into a contract on April 30th, 2003 in which the Plaintiff agreed to manufacture "Kingston" brand cigarettes for the Defendant. Id. at 1; Joint Stipulations of Facts Ex. A, Nov. 1, 2010, ECF No. 68-1 (the contract). The Defendant, a distributor, would then sell the "Kingston" cigarettes.

1

The manufacturing contemplated in the contract implicates the 1998 Tobacco Master Settlement Agreement ("the MSA"). Joint Stipulations of Facts 2. Pursuant to the MSA, non-signatory manufacturers, also referred to as "non-participating manufacturers," must place a certain sum of money into an escrow account for each carton of cigarettes sold which they manufactured. Va. Code Ann. § 3.2-4205. The parties do not contest the per carton amount that the Plaintiff, a non-participating manufacturer, was required to place into escrow. Joint Stipulations of Facts 2-3. The states in which the cigarettes were sold require the non-participating manufacturer, in this case the Plaintiff, to furnish annual certifications as to the number of cigarettes sold in a given state. Id. at 3. The states use the annual certifications as a tool to ensure compliance with the non-participating manufacturer's escrow obligations. Id. The Plaintiff provided these certifications to the three states at issue, Virginia, North Carolina, and South Carolina, but not to the Defendant. Id. at 4. In the event that a non-participating manufacturer like the Plaintiff does not make the required escrow payments, the manufacturer risks being delisted from the state's directory of approved manufacturers. Id. If a manufacturer is not listed in the state directory, its products cannot be sold in that state. Id. In addition to escrow obligations to the various states, cigarette sales also trigger various federal taxes and assessments. Id. at 5. The Defendant does not contest that it "agreed to pay the federal taxes and assessments associated with "Kingston" cigarettes, in addition to the charges imposed under the MSA and related state statutes." Id.

In December 2009, the Plaintiff demanded payment for $960,808.41 worth of cigarettes it delivered to the Defendant. Id. To date, the Defendant has not paid for these

cigarettes. Id. In early 2010 the Plaintiff sent additional invoices to the Defendant, which have also gone unpaid, bringing the total unpaid invoices up to $970,559.08. Id. The Plaintiff has conceded, however, that the Defendant is entitled to several credits which lower the amount outstanding on the invoices to $919,865.62. Pl.'s Proposed Findings of Fact and Conclusions of Law 12-13, Nov. 16, 2010, ECF No. 85. The Defendant indicated to the Plaintiff that it believed it had overpaid the amounts due for escrow. Joint Stipulations of Facts 6. Nonetheless, the Defendant continued selling "Kingston" cigarettes into 2010, which engendered further escrow obligations and federal taxes and assessments. Id. On August 31st, 2010, the State of North Carolina sued the Plaintiff for unpaid escrow, seeking penalties and interest. Id. That lawsuit is still pending.

In a letter dated January 21st, 2010, the Plaintiff informed the Defendant that the contract was terminated effective immediately. Id. at 7. Soon thereafter, in February 2010, the Plaintiff requested that the governments of the states in which "Kingston" brand cigarettes were being sold de-list that brand from their respective directories.[1] Id. In addition to the $919,865.62 of unpaid invoices, the parties also stipulate that the Defendant has failed to pay the Plaintiff $50,475.70 for unused packaging and inventory pursuant to the contract. Id. at 6.

## **THE DISPUTED FACTS**

---

[1] The Joint Stipulations of Facts puts the de-listing date sometime in February 2009. This appears to be a typographical error, as the testimony at trial was that the de-listing occurred in "late January, early February…2010." Day 1 Trial Transcript at 84, Virginia Brands, LLC v. Kingston Tobacco, Inc., No. 4:10CV0009 (W.D.Va. Nov. 10, 2010), ECF No. 82. A 2010 de-listing also fits into the timeline more logically, since it is uncontroverted that sales of "Kingston" cigarettes took place throughout 2009 and into early 2010.

3

Based on the evidence presented during the trial, the Court finds that the Defendant underpaid its contract-mandated escrow contributions on "Kingston" cigarettes. The Defendant made overpayments towards escrow in 2003 and 2004, but the Plaintiff refunded those overpayments in accordance with the contract. Joint Stipulations of Facts Ex. A 2-3 (relevant contract provision). Despite having received documentation of the refunds in September 2004, the Defendant made no complaints whatsoever about the refunds until around the time of this lawsuit. Day 2 Trial Transcript at 113-15, Virginia Brands, LLC v. Kingston Tobacco, Inc., 4:10CV0009 (W.D.Va. Nov. 10, 2010), ECF No. 83 (testimony of Amanda Heath, bookkeeper for the Defendant). Even then, the Defendant's only dispute centered on interest for loans taken out by the Plaintiff in order to pay the pre-"CAP release" escrow and attorney's fees associated with maintaining the account.[2] Id. Plaintiff's exhibit sixteen, which the Defendant received in September 2004, contains a lengthy catalogue of fees for attorneys, interest, and escrow, none of which the Defendant company objected to for over five years. Id. In addition to casting doubt on the objection itself, the Court notes that Virginia has a four year statute of limitations for breaches of goods contracts. Va. Code Ann. § 8.2-725. For 2005, the Plaintiff does not allege an escrow underpayment and the Defendant presented no evidence of an overpayment for that year.

Defendant's exhibit forty-one shows a $4,549,764.89 combined escrow obligation in 2006 for Virginia, North Carolina, and South Carolina. The Defendant stipulated that it paid the Plaintiff only $225,924.96 towards escrow. Joint Stipulations of Facts 6. Although the Defendant claims that its CEO entered into an oral agreement with the

---

[2] Both the Plaintiff's witness and the Defendant's witness agreed that 2003 and 2004 were so-called "CAP release years." In those years, the Plaintiff was obligated to make a large initial escrow deposit and thereafter would get a portion of those funds back through the CAP release.

4

owner of the Plaintiff company whereby it would only be responsible for half the escrow obligation in 2006, the defense's only witness, the company bookkeeper, had no firsthand knowledge of the agreement. Day 2 Trial Transcript at 77. The only witness with such knowledge to testify at trial was the owner of the Plaintiff company, who testified that there was no agreement for each party to pay half the 2006 escrow. Day 1 Trial Transcript at 68-9, Virginia Brands, LLC v. Kingston Tobacco, Inc., 4:10CV0009 (W.D.Va. Nov. 10, 2010), ECF No. 82 (testimony of the owner of the Plaintiff company, Marvin Ligon). The Court accepts the testimony of the witness with firsthand knowledge about this matter, putting the Defendant's unpaid escrow obligation at $4,323,839.93 for 2006.

In 2007 and 2008, the Defendant overpaid its escrow obligation, which offset the large, unpaid sum from 2006. Both parties agree that the Defendant paid $2,200,498.08 for escrow in 2007. Joint Stipulations of Facts 6. At trial, the Defendant agreed that its total 2007 escrow obligation was $1,448,652.56, a difference of $751,845.52 from the amount invoiced. Day 2 Trial Transcript at 69-73. For 2008, Defendant's exhibit forty one shows that the total escrow due for all three states at issue was $603,679.72, whereas the Defendant paid $1,547,837.62. Joint Stipulations of Facts 7. The difference in those 2008 figures is $944,157.90. Due to these overpayments, the Defendant's unpaid escrow obligation by the end of 2008 dropped to $2,627,836.51.

In 2009, the Plaintiff began manufacturing a second brand of cigarettes for the Defendant, which was marketed under the name "Palmetto." There was no written contract between the parties for the manufacture of "Palmetto" cigarettes, just an oral agreement. Day 1 Trial Transcript at 73. At trial, the owner of the Plaintiff company

5

testified that the Defendant agreed to cover the costs associated with "Palmetto" for escrow, fees, and assessments. Id. at 74. The defense witness did not counter this assertion. The Defendant admits that it made no payments whatsoever into escrow for "Kingston" or "Palmetto" in 2009 and 2010. Joint Stipulations of Facts 7. At trial, the Defendant's bookkeeper further conceded that as of the end of 2008 the Defendant had not overpaid the Plaintiff for escrow. Day 2 Trial Transcript at 109-10. In fact, the bookkeeper indicated that if it were not for the lawsuit, the Defendant would have paid the escrow due for 2009 and 2010. Id. at 110.

The certifications from Virginia, North Carolina, and South Carolina, which were entered into evidence at trial as Plaintiff's exhibits nine, ten, and eight respectively, indicate a total of 57,883,400 "Kingston" and "Palmetto" cigarettes sold in 2009 in those three states. The parties have agreed that the applicable per cigarette amount to be placed into escrow in 2009 was $0.0266359. Joint Stipulations of Facts 3. Multiplying the total cigarettes sold in 2009 by the 2009 per cigarette escrow factor yields a figure of $1,541,776.44, which is the amount the "Kingston" contract and the "Palmetto" agreement obligate Defendant to place into escrow for the year.

Plaintiff's exhibit eleven is a complaint filed by the State of North Carolina against the Plaintiff company for unpaid escrow. In that complaint, the North Carolina Attorney General's Office avers that in the first half of 2010 a total of 4,147,000 "Kingston" and "Palmetto" cigarettes were sold in the state, giving rise to a total escrow liability of $113,772.95. In addition to the North Carolina sales, the Virginia Attorney General's Office provided the Plaintiff with a chart detailing per pack sales of "Kingston" cigarettes from 2006 to 2010. The Court admitted this chart into evidence at Plaintiff's

exhibit twelve. The chart shows that 7,140 packs of "Kingston" cigarettes were sold in Virginia in 2010, which translates into 142,800 individual cigarettes.[3] Multiplying the total number of cigarettes sold in the commonwealth by the stipulated per cigarette amount to be placed in escrow for 2010 yields a Virginia escrow liability of $3,917.71 for the year. Joint Stipulations of Facts 3 (per cigarette amount to be put in escrow was $0.0274350 per cigarette for 2010). Combining the information available concerning Virginia and North Carolina sales for the year, the written "Kingston" contract and the oral "Palmetto" contract obligate the Defendant to pay the Plaintiff $117,690.66 for 2010 escrow. For 2006 to the present, the sum of the total outstanding escrow contributions that the Defendant must pay to the Plaintiff is $4,287,303.61.

The Defendant also failed to pay for several shipments of "Kingston" cigarettes. In December 2009 the owner of the Plaintiff company met with the CEO of the Defendant company to discuss delinquent payments for product. Day 1 Trial Transcript at 76-7. At trial, the owner of the Plaintiff company testified that the CEO of the Defendant company "came to my office and we discussed payments or nonpayments. And I basically was told, 'No, I don't owe you anything. You owe me money. I'm not paying. I can't pay you.'" Id. at 77. Although the CEO of the Defendant company was on the defense's witness list, he did not testify. Def.'s Witness List 1, Oct. 12, 2010, ECF No. 56. Not only did the statements of the Plaintiff's witness go unrebutted, the Defendant relies on the above quoted testimony in its Proposed Findings of Fact and Conclusions of Law. Def.'s Proposed Findings of Fact and Conclusions of Law 9, Nov. 16, 2010, ECF No. 86. The Defendant then goes on to explain that it did not pay the product invoices because it was unsure of whether it had overpaid on its escrow

---

[3] The Virginia Attorney General's Office considers a "pack" to be twenty cigarettes.

7

obligations.  Id.  Notably, the Defendant has not alleged that the $919,865.62 in goods it received, accepted, and re-sold were defective or were otherwise not a perfect tender.[4]

## CONCLUSIONS OF LAW

I. Plaintiff's Motions Under Fed. R. Civ. P. 15(b)

During trial, the Plaintiff made two motions to conform the pleadings to the evidence presented under Fed. R. Civ. P. 15(b), both of which the Court granted.  Day 2 Trial Transcript at 30.  The Plaintiff first moved to add a claim for escrow underpayments from 2006 based on evidence offered by the Plaintiff's witness.  Id. at 25.  In the Complaint, the Plaintiff sought relief relating to underpayments and nonpayments for 2009 and 2010, as well as "an additional undetermined amount…for escrow liabilities arising from recent state tax assessments and any future assessments for the period from 2003 to 2010."  Notice of Removal Ex. A. 5-6, Mar. 15, 2010, ECF No. 1-1.  The Defendant objected to the Plaintiff's request to increase the demand for damages to reflect 2006 underpayments, characterizing the motion as an attempt to engage in "trial by ambush."  Day 2 Trial Transcript at 29.  Fed. R. Civ. P. 15(b)(1) provides that "[t]he court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits."  Evidence might cause prejudice to the nonmovant where "[b]elated claims…change the character of litigation" and "[t]he proof required to defend against [the] new claim would be of an entirely different character than the proof which the defendant had been led to believe would be necessary." Dank v. Shinseki, 374 Fed.Appx. 396, 401 (4th Cir. 2010) (citing Deasy v. Hill, 833 F.2d 38, 42

---

[4] Although the Joint Stipulations of Facts put the amount of the unpaid invoices at $970,559.08, the Plaintiff has conceded that the Defendant is entitled to credits that lower the amount due to $919,865.62. Compare Joint Stipulations of Facts 5 with Pl.'s Proposed Findings of Fact and Conclusions of Law 12-13.

8

(4th Cir. 1987)). Central to the Court's inquiry under Fed. R. Civ. P. 15(b)(1) is whether the nonmovant has been taken by surprise. C&E Services, Inc. v. Ashland Inc., 601 F.Supp.2d 262, 274 (D.D.C. 2009). It is difficult to imagine how the Defendant could have been surprised by the 2006 claim. Not only did the Complaint put the Defendant on notice that escrow liabilities as far back as 2003 might be at issue, but the Plaintiff furnished the Defendant with annual certifications from the three states at issue going as far back as 2003. Notice of Removal Ex. A. 5-6 (Complaint); Joint Stipulations of Facts 3 (annual certifications). Furthermore, the Defendant both cross-examined the Plaintiff's witness on the subject of 2006 escrow at trial and questioned the Plaintiff's witness on the same issue during a deposition in September 2010. Day 1 Trial Transcript at 144. The addition of the 2006 claim does not change the nature of this case and the Defendant did not convince the Court that it had not anticipated the issue. Fed. R. Civ. P. 15(b)(1) ("[t]he court should freely permit an amendment when…**the objecting party fails to satisfy the court** that the evidence would prejudice that party's action or defense") (emphasis added).

The Plaintiff's second Rule 15(b)(1) motion was to add a claim for escrow, tax, fee, and invoice nonpayment for "Palmetto" brand cigarettes. Day 2 Trial Transcript at 26. The Defendant objected, pointing out that "Palmetto" appeared nowhere in the pleadings and suggesting that if the Plaintiff wanted to make an issue of "Palmetto," it should have sought leave to amend its pleadings to that effect before trial. Id. at 29. Once again, the evidence produced in discovery and the Rule 30(b)(6) depositions work against the Defendant. Defendant's exhibit ten, for example, contains a number of "Palmetto" invoices. Indeed, the "Palmetto" and "Kingston" cigarettes did not appear on the same

9

invoices, rather the Plaintiff invoiced the two brands separately. "Palmetto" also came up frequently during the depositions of the Defendant's bookkeeper and the CEO of the Defendant company. Id. at 26-28. The Defendant even questioned the owner of the Plaintiff company about "Palmetto" during his Rule 30(b)(6) deposition. Id. The Defendant was hardly ambushed by the "Palmetto" issue.

II. The Statue of Frauds Defense for "Palmetto"

The Defendant further objects to the introduction of the escrow claim for the "Palmetto" cigarettes on statute of frauds grounds. Def.'s Resp. to Pl.'s Proposed Findings of Fact and Conclusions of Law 5, Nov. 23, 2010, ECF No. 87. Two factors determine whether there is a viable statue of frauds defense. Va. Code Ann. § 8.2-201. The Court must first inquire whether the contract is within the statue of frauds. Id. If the contract is within the statue of frauds, then the Court should determine whether the statue of frauds has been satisfied. Id. In support of its position, the Defendant cites Va. Code Ann. § 8.2-201(1), which provides the parameters of which UCC contracts are covered by the statue of frauds and also provides one manner in which the statute of frauds may be satisfied, namely by a writing. The Defendant appears to have missed § 8.2-201(3), which provides three other ways to satisfy the statue of frauds. Applicable in this case is § 8.2-201(3)(c), which provides that the statue of frauds is satisfied "with respect to goods…which have been received and accepted." There is no question that the Defendant received and accepted the "Palmetto" cigarettes at issue. The owner of the Plaintiff company testified that the Defendant agreed to cover the escrow and various other taxes and fees associated with "Palmetto" cigarettes in the same manner that it was doing for "Kingston" cigarettes. Day 1 Trial Transcript at 74. The owner further pointed

out that Plaintiff's exhibit two, an August 19th, 2009 invoice for "Palmetto" cigarettes, listed charges for federal excise taxes and escrow. Id. at 74-5. The Defendant's only witness did not rebut this testimony. In fact, Defendant's exhibit ten also contains several "Palmetto" invoices that include line-items for federal excise taxes and escrow. These "Palmetto" invoices never drew any objections from the Defendant company. Id. at 75. The evidence is more than sufficient that the Defendant was to pay escrow, taxes, and fees for any "Palmetto" cigarettes it accepted.

III. Defendant's Motion to Dismiss the Plaintiff's Claim for Penalties

The Defendant also made a motion at trial to dismiss the Plaintiff's claim for civil penalties associated with the State of North Carolina's lawsuit against the Plaintiff to recover unpaid escrow from 2009 and 2010. Day 2 Trial Transcript at 31. The Defendant asserted that the sum the Plaintiff sought for the penalties, $4,618,282.59, was entirely speculative. Id. Indeed, figure offered for the potential penalties in North Carolina is just that—potential. It is based on the maximum penalty permitted by statute, which is three hundred percent of the unpaid escrow. N.C. Gen. Stat. Ann. § 66-291(c)(2). Ultimately, though, the penalty imposed lies in the discretion of the Wake County Superior Court. Id. (providing that "[t]he court, upon a finding of a knowing violation…**may** impose a civil penalty…**not to exceed** three hundred percent (300%) of the original amount improperly withheld from escrow") (emphasis added). The claim for the potential civil penalties from the State of North Carolina's currently pending lawsuit against the Plaintiff is, as the Defendant posits, speculative and the Court therefore dismisses it. Charter Federal Savings Bank v. Office of Thrift Supervision, 976 F.2d 203, 208 (4th Cir. 1992) (a case is not ripe if it is dependent on future uncertainties).

IV. The Defendant Materially Breached the Contract

There is no question that the Defendant accepted over $900,000 in cigarettes and did not pay for them. Joint Stipulations of Facts 5. The Defendant never complained that the cigarettes sent to it were defective or otherwise did not conform to its order and it would now be too late to do so. Flowers Baking Co. of Lynchburg v. R-P Packaging, Inc., 329 S.E.2d 462, 466-67 (Va. 1985) (where the buyer's rejection is unreasonably late, Va. Code Ann. § 8.2-606(1)(b) implies acceptance). The Court further finds that the Defendant is $4,287,303.61 in arrears on escrow payments for cigarettes it accepted and re-sold. Va. Code Ann. § 8.2-606(1)(c) (the buyer accepts when the buyer "does any act inconsistent with the seller's ownership"). Once the Defendant accepted the cigarettes, it was obligated to pay the Plaintiff "**at the contract rate** for any goods accepted." Va. Code Ann. § 8.2-607(1) (emphasis added). The contract made clear reference to an attachment, "exhibit A," which provided the contract rate for the cigarettes. Joint Stipulations of Facts Ex. A 3. Notably, the contract's "exhibit A" listed an escrow charge as part of the contract rate. Id. at 5. See also Day 1 Trial Transcript at 76 (owner of the Plaintiff company's testimony that if the Defendant company were not responsible for escrow on "Palmetto" sales, the Plaintiff would be selling cigarettes at a loss). The contract further stated that the price was subject to change every ninety days, and the Defendant company never objected to any of the price changes. Day 1 Trial Transcript at 41. Unless the contract provides otherwise, which the contract in this case does not, payment is due to the seller upon the buyer's acceptance. Va. Code Ann. § 8.2-507(1). After the buyer has accepted, the buyer cannot defend nonpayment on the grounds that the contract rate to which it agreed might be too high. The Defendant, therefore, first

12

breached the contract at the end of 2006 when it failed to pay at the contract rate for product the Plaintiff tendered and it accepted without objection. The Defendant further breached the contract towards the end of 2009 when the Plaintiff demanded payment and the Defendant refused to pay.

It was not until January 2010 that the Plaintiff sent a letter to the Defendant proclaiming the contract "hereby terminated." Joint Stipulations of Facts 7. The Defendant complains that the Plaintiff did not give ninety days prior written notice for termination as contemplated by the contract. Joint Stipulations of Facts Ex. A 3 (ninety day notice provision). Although the January 2010 letter advised that the contract had been "terminated," the Plaintiff was actually cancelling the contract because of the Defendant's breach.[5] The Code of Virginia provides that "[w]here a buyer wrongfully…fails to make a payment due on…delivery…the seller may…cancel." Va. Code Ann. § 8.2-703(f). Regardless of a contract's notice provisions, a seller has no obligation to continue performance upon a contract that the buyer has materially breached by nonpayment. Va. Code Ann. § 8.1-103 (commercial code retains common law contract principals that it does not particularly displace); 3C Michie's Jurisprudence Commercial Law § 25 (2008) (nonpayment is a material breach); Tandberg, Inc. v. Advanced Media Design, Inc., No. 1:09CV0863, 2009 WL 4067717, at *4 (E.D.Va. Nov. 23, 2009) ("under Virginia law, it is well-settled that failure to make timely payment constitutes a material breach"); Horton v. Horton, 487 S.E.2d 200, 204 (Va. 1997) (a material breach by one party excuses the other party from performance).

---

[5] The distinction in terminology is important. Under Article Two of the Uniform Commercial Code as adopted by Virginia, a "[t]ermination occurs when either party…puts an end to the contract otherwise than for its breach," whereas "[c]ancellation occurs when either party puts an end to the contract for breach by the other." Compare Va. Code Ann. § 8.2-106(3) with Va. Code Ann. § 8.2-106(4).

V. Ownership of the Escrow Accounts

The Defendant contends that it has an ownership interest in the money it gave to the Plaintiff to pay escrow obligations. Def.'s Resp. to Pl.'s Findings of Fact and Conclusions of Law 2. From that premise, the Defendant asserts that it is entitled to share in the interest the escrow accounts generated and the profits from selling parts of two of the accounts. Id. By the terms of the Tobacco Master Settlement Agreement and the laws enacted by the Virginia General Assembly pursuant to the Settlement, the interest earned from the escrow account belongs to the Plaintiff, Virginia Brands. Va. Code Ann. § 3.2-4201(B); Star Scientific Inc. v. Beales, 278 F.3d 339, 350 (4th Cir. 2002) ("[u]nder the escrow arrangement, the manufacturer receives interest currently on the funds in the escrow account and the full principal not used to pay judgments after 25 years"). Referring to the funds in escrow, Va. Code Ann. § 3.2-4201(B) provides that non-participating manufacturers like the Plaintiff "shall receive the interest or other appreciation on such funds as earned." Accord U.S. v. McLaughlin, ---F.Supp.2d---, 2010 WL 3528632, at *1-*2 (W.D.Va. 2010) (in a prosecution of a non-participating manufacturer for conspiracy to distribute contraband cigarettes and evasion of the federal cigarette excise tax, the court observed that the manufacturer was entitled to interest earned on the escrow account). "[I]nterest…as earned" means that non-participating manufacturers that "deposit funds into an escrow account are entitled to receive the interest or other appreciation of those funds while they remain in the escrow account." Council of Independent Tobacco Manufacturers of America, et al. v. State, 713 N.W.2d 300, 312 (Minn. 2006) (explaining a provision of the Master Settlement Agreement which was codified in Virginia as Va. Code Ann. § 3.2-4201(B)).

In <u>Sudamax Industria E Comercio De Cigarros v. Butts & Ashes, Inc.</u>, the U.S. District Court for the Western District of Kentucky considered a dispute over escrow payments between a distributor and a non-participating manufacturer much like the case currently before this Court. <u>Sudamax Industria E Comercio De Cigarros v. Butts & Ashes, Inc</u>, No. 1:05CV60, 2005 WL 2206066, *1 (W.D.Ky. Sept. 9. 2005). In that case, the defendant-distributor made a motion to dismiss on the basis that several of the states in which it sold the plaintiff-manufacturer's cigarettes had not been joined in the lawsuit and that those states were indispensable parties. <u>Id.</u> The Court held that the states were not indispensable parties in the escrow dispute because, no matter the outcome of the breach of contract suit before that Court, the non-participating manufacturer would be held responsible for the escrow payments. <u>Id.</u> at *3. Importantly, the Court pointed out that the distributor's obligation with regard to escrow was a matter strictly between the manufacturer and the distributor, not between the government and the distributor. <u>Id.</u> The Court further noted that any obligation on the distributor's part arose only by private contract, not by statute. <u>Id.</u> See also <u>Sudamax Industria E Comercio De Cigarros, Ltda. v. Butts & Ashes</u>, No. 1:05CV60, 2007 WL 1035144, *4 (W.D.Ky. Mar. 29, 2007) (Court's memorandum opinion on a later motion for summary judgment in the <u>Butts & Ashes</u> case).

In the case at bar, the Defendant's commitment to make contributions towards escrow arose by operation of contract, not operation of law. <u>Butts & Ashes, Inc.</u>, 2005 WL 2206066, at *3; Notice of Removal Ex. A 12. The Defendant gave the money to be put in escrow to the Plaintiff so that the Plaintiff could place the money in its escrow account. Notice of Removal Ex. A 12-13 (contract provision that the Plaintiff will charge

the Defendant a premium on each carton of cigarettes "as a payment in anticipation of [the Plaintiff] making the escrow payment for products sold by [the Defendant]"). Under Virginia law, both the obligation to pay into the escrow and the right to receive the interest from the escrow belonged to the Plaintiff. Va. Code Ann. § 3.2-4201(A)(2) & (B). The parties were free to contract away the ownership of the interest, but they did not. Butts & Ashes, Inc., 2005 WL 2206066, at *3; Notice of Removal Ex. A 12 (paragraph seven of the contract provides only for the escrow monies as initially paid in, but is silent as to interest accrued on the escrow account, which the contract clearly provides in paragraph four will be established by the Plaintiff); Day 1 Trial Transcript at 120 (testimony of the owner of the Plaintiff company that interest sharing on the escrow accounts was never discussed with the Defendant). In the absence of another arrangement made privately between the parties, the interest accruing on the escrow account belongs to the Plaintiff, thereby precluding the Defendant's claims for interest and sale money from the escrow accounts. Va. Code Ann. § 3.2-4201(B).

VI. The Delisting Claim

The Defendant contends that the Plaintiff "had Kingston brand cigarettes delisted from the directories of various states in which they were sold" and that "Kingston Tobacco did not authorize Virginia Brands to delist the Kingston brand." Def.'s Proposed Findings of Fact and Conclusions of Law 10. The Plaintiff cannot order a company delisted from the directory. Only the government has the power to delist a cigarette brand and the discretion to do so ultimately lies with the state Attorney General in Virginia and South Carolina and the Department of Revenue in North Carolina. Va. Code Ann. § 3.2-406; N.C. Gen. Stat. Ann. § 105-113.4B; S.C. Code Ann. § 11-48-30.

In each of these three states, the decision to delist a cigarette brand is considered an administrative action and state civil procedure controls where the aggrieved subject of a delisting may contest the agency action.[6] Va. Code Ann. § 3.2-4214; N.C. Gen. Stat. Ann. § 105-113.4B; S.C. Code Ann. § 11-48-70. The Plaintiff is simply not the proper party against whom to litigate the issue of wrongful delisting and the U.S. District Court is not the proper place to bring such an action.

## CONCLUSION

For the reasons set out and explained above, the Court will **ENTER JUDGMENT IN FAVOR OF THE PLAINTIFF IN THE AMOUNT OF $5,257,644.92**.

ENTERED this 10th day of December, 2010.

                                                                        s/Jackson L. Kiser
                                                                       Senior United States District Judge

---

[6] In Virginia, the Attorney General's decision to delist a brand may be appealed to the state Circuit Court. Va. Code Ann. § 3.2-4214 (referencing the Administrative Process Act); Citland, Ltd. v. Com. ex rel. Kilgore, 610 S.E.2d 321, 323-24 (Va. App. 2005) (under the Administrative Process Act an administrative appeal goes to the Circuit Court). In North Carolina, administrative appeals go to the state Superior Court. N.C. Gen. Stat. Ann. § 150B-43 et seq. After exhausting all administrative remedies, an appeal from a delisting may be reviewed by the Court of Common Pleas in South Carolina. S.C. Code Ann. § 1-23-380.